Wesley R. SPRATT

v.

STATE of Rhode Island.

No. 2010–205–Appeal.

Supreme Court of Rhode Island.

April 13, 2012.

Wesley R. Spratt, Pro Se.

Susan B. Iannitelli, Esq., Standby Counsel, for Applicant.

Aaron L. Weisman, Department of Attorney General, for State.

Present: SUTTELL, C.J.,
GOLDBERG, FLAHERTY, ROBINSON,
and INDEGLIA, JJ.

## OPINION

Justice INDEGLIA, for the Court.

The applicant, Wesley R. Spratt (applicant or Spratt), appeals *pro se* from a judgment of the Superior Court denying his application for postconviction relief. On appeal, Spratt alleges numerous errors of law and constitutional violations. This case came before the Supreme Court for oral argument on January 24, 2012, pursuant to an order directing the parties to appear and show cause why the issues raised in this appeal should not be summarily decided. After carefully considering the written and oral submissions of the parties, we are satisfied that this appeal may be resolved without further briefing or argument. For the reasons set forth in this opinion, we affirm the judgment of the Superior Court.

## I

### Facts and Travel

The facts underlying Spratt's convictions are set forth in *State v. Spratt*, 742 A.2d 1194 (R.I.1999) (*Spratt I*). The original indictment against Spratt contained five counts: murder, robbery in the first degree, larceny of a firearm, carrying a pistol without a license, and the commission of a crime of violence when armed with a stolen firearm.[1] It appears that the Attorney General also provided notice that upon conviction, Spratt was subject to the imposition of an additional sentence based on the habitual-criminal statute. After a Su-

perior Court jury trial, Spratt was found "guilty of [murder] * * * while committing or attempting to commit robbery, guilty of first-degree robbery, guilty of carrying a pistol without a license, and guilty of committing a crime of violence while armed with a firearm." *Spratt I*, 742 A.2d at 1197. The jury acquitted Spratt of the charge of larceny of a firearm. The trial justice sentenced Spratt to life imprisonment for first-degree murder, ten years for each weapons-related offense to run consecutively to the life sentence, and twenty years for being adjudged a habitual offender, also to be served consecutively to the other sentences. This Court denied Spratt's appeal from his convictions in *Spratt I*.

In November 2000, in an apparent attempt to notify the Superior Court that an application for postconviction relief was forthcoming, Spratt (then a *pro se* applicant) filed a "Notice of Post–Conviction Remedy" with the Superior Court. In March 2003, Spratt filed a formal application for postconviction relief based on G.L. 1956 § 10–9.1–1. Upon his request, Spratt was later appointed counsel to represent him in those proceedings. Also in 2003, Spratt filed an application for a writ of habeas corpus with the United States District Court for the District of Rhode Island, under 28 U.S.C. § 2254 (2000).

During Spratt's postconviction-relief hearing on October 14, 2003, he contended "that the Superior Court lacked jurisdiction to consider his application and demanded that his postconviction arguments be heard instead by the Federal District Court." *Spratt v. State*, 926 A.2d 1016, 1016 (R.I.2007) (mem.) (*Spratt II*). Ac-

---

1. General Laws 1956 § 11–47–3.1 states in pertinent part:

   "No person shall commit a crime of violence when armed with or having available a stolen firearm. Every person violating

   the provisions of this section shall be punished * * *. The sentence imposed shall be consecutive to the underlying sentence for the crime of violence."

cordingly, the Superior Court dismissed his state application. Thereafter, in an order dated March 1, 2005, the Federal District Court stayed Spratt's federal application until he first exhausted his state court remedies.

On March 24, 2005, Spratt re-filed his application for postconviction relief in the Superior Court. However, the Superior Court subsequently dismissed Spratt's refiled application without prejudice on April 8, 2005, because Spratt had voluntarily dismissed his prior application. Spratt appealed this dismissal. In an order from this Court dated June 11, 2007, we vacated the dismissal and remanded the case to the Superior Court to ensure that the applicant receive a full postconviction-relief hearing on the merits. *See Spratt II*, 926 A.2d at 1016.

On May 22, 2009, a postconviction-relief hearing was held in which Spratt, his court-appointed counsel, and the state each were given time to address the merits of Spratt's postconviction-relief application.[2] At the conclusion of the hearing, Spratt's petition was denied, which denial Spratt

now appeals.[3] Although Spratt is pursuing his appeal pro se, and he prepared the statements submitted in support of his appeal in that capacity, this Court granted his motion for the appointment of stand-by counsel.[4]

Additional facts that are pertinent to the issues on appeal will be supplied in the following discussion.

## II

### Issues on Appeal

Spratt's appeal suggests numerous errors of law and constitutional violations committed by the hearing justice in denying his application for postconviction relief. These assertions include that the hearing justice (1) wrongfully dismissed his contention that a courthouse identification of Spratt by a witness was improperly orchestrated by the state; (2) erroneously denied his assertion that an in-court witness identification of Spratt was unreliable and violated his due-process rights; (3) improperly denied his claim that the police purposely withheld profile photographs in

2. Prior to the May 22, 2009 hearing, Spratt's court-appointed counsel submitted a fifty-two-page *Shatney* memorandum, discussing how Spratt's application for postconviction relief lacked merit and requesting permission to withdraw as counsel. *See Shatney v. State*, 755 A.2d 130, 135 (R.I.2000). The hearing justice accepted counsel's memorandum and permitted him to withdraw.

3. The hearing justice who considered all of Spratt's applications for postconviction relief also was the justice who presided at Spratt's trial.

4. The record indicates that shortly after Spratt filed his appeal with this Court, a "waiver letter" was mistakenly sent to him, offering to him the option of bypassing the prebriefing process under Article I, Rule 12A of the Supreme Court Rules of Appellate Procedure, and enabling his case to be assigned for full briefing and argument. Spratt signed and returned the "waiver letter" and filed a

motion requesting that he be allowed to file a sixty-four-page full brief, which motion subsequently was denied. The applicant submitted additional documents to this Court arguing that we could not issue a "proper and just summary ruling" in this case without reviewing his sixty-four-page full brief. At oral argument, Spratt raised the issue of his previous attempts to file his sixty-four-page brief, with supporting appendix. The state, in its response during oral argument, had no objection to the filing of this additional documentation. In light of the fact that applicant put significant emphasis on submitting this brief for our review, this Court issued an order giving him leave to file this additional documentation—with which he complied. Our review of this matter includes these additional documents in conjunction with all other submitted memoranda and arguments presented to the Court.

violation of *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963) and Rule 16 of the Superior Court Rules of Criminal Procedure; (4) incorrectly rejected his claim of unlawful sentencing; and (5) wrongly dismissed his assertions of ineffective assistance of counsel. Additionally, Spratt argues that the evidence that the state presented at trial was insufficient to convict him. We shall address each of these contentions in turn.

## III

### Standard of Review

"The postconviction remedy, set forth in § 10–9.1–1, provides that 'one who has been convicted of a crime may seek collateral review of that conviction based on alleged violations of his or her constitutional rights.'" *Brown v. State*, 32 A.3d 901, 907 (R.I.2011) (quoting *Lynch v. State*, 13 A.3d 603, 605 (R.I.2011)). "An applicant for such relief bears '[t]he burden of proving, by a preponderance of the evidence, that such relief is warranted' in his or her case." *Id.* (quoting *State v. Laurence*, 18 A.3d 512, 521 (R.I.2011)). In reviewing the denial of postconviction relief, "[t]his Court will not disturb a [hearing] justice's factual findings made on an application for post-conviction relief absent clear error or a showing that the [hearing] justice overlooked or misconceived material evidence in arriving at those findings." *Chapdelaine v. State*, 32 A.3d 937, 941 (R.I.2011) (quoting *Gordon v. State*, 18 A.3d 467, 473 (R.I.2011)). We "review *de novo* any post-conviction relief decision involving questions of fact or mixed questions of law and fact pertaining to an alleged violation of an applicant's constitutional rights." *Gordon*, 18 A.3d at 473 (quoting *Bustamante v. Wall*, 866 A.2d 516, 522 (R.I.2005)).

## IV

### Discussion

The victim in the case, Christopher Naylor (the victim) was fatally wounded while working as a parking-lot attendant on Snow Street in Providence on December 20, 1995. Spratt was arrested later that evening and was eventually charged with murder and the other offenses already discussed. At trial, several witnesses testified against Spratt. Anthony Tortolani (Mr. Tortolani), an acquaintance of Spratt's, testified that on the night of the murder, Spratt told him that he was going to rob someone that night, and showed him a gun. Mark Warren (Mr. Warren), another witness, testified that he accompanied Spratt to the Snow Street parking lot, saw him enter the parking attendant's booth, and then saw Spratt running out of the booth a few seconds later. Mr. Warren further testified that he heard a cry for help and that, when he later questioned Spratt about it, Spratt stated that the attendant had "scuffled" with him. *Spratt I*, 742 A.2d at 1197. A third witness, Raymond Perrin (Mr. Perrin), testified that he saw someone running from the booth as he was cleaning snow from his car at the Snow Street parking lot. Mr. Perrin stated that he saw the profile of the man's face from roughly fifteen feet away for approximately ten to fifteen seconds. At the trial, Mr. Perrin identified Spratt as the man he saw fleeing the scene.

Spratt's major contention in his application for postconviction relief centers on the trial testimony of Mr. Perrin.

### A

### The Courthouse Encounter

Spratt argues on appeal that the hearing justice wrongfully dismissed his claim that a courthouse identification of Spratt by Mr. Perrin was improperly orch-

estrated by the state. The record reflects that at some point during trial, and in response to the state's request, Mr. Perrin came to the courthouse for a meeting with the state prosecutor. While sitting in a courthouse hallway waiting for the meeting, Mr. Perrin saw Spratt being escorted down the hallway by two marshals. Soon afterward, in a meeting with state prosecutors, defense counsel, and police detectives, Mr. Perrin reported the recent chance encounter by stating "I saw him; and as soon as I saw him, I knew who he was." Spratt contends that this encounter was improperly orchestrated by the state and that, therefore, Mr. Perrin's subsequent in-court identification was unconstitutional.

This Court previously decided a case with a virtually identical scenario in *State v. Bertram*, 591 A.2d 14 (R.I.1991), in which a witness recognized the defendant prior to trial as she was waiting in a courthouse corridor. The defendant in *Bertram*, 591 A.2d at 26, argued that the trial justice erred by allowing the witness to identify the defendant at trial after the chance encounter. Although the witness in *Bertram* was at the courthouse at the request of the Attorney General's office, this Court held that no suppression of the identification was necessary because there was no evidence indicating that the confrontation with the defendant was orchestrated by the police or prosecution. *Id.* at 27; *see also State v. Pailin*, 576 A.2d 1384, 1389 (R.I.1990) (holding that an "accidental encounter" in the courthouse between a witness and a defendant did not necessitate suppressing the subsequent in-court identification).

In the instant case, there is likewise no evidence that police or prosecutors planned the encounter between Spratt and Mr. Perrin. Furthermore, after this encounter came to light, the trial justice conducted a mid-trial voir-dire hearing out of the presence of the jury, consuming fifty-seven pages of trial transcript, in which Mr. Perrin was subject to extensive direct and cross-examination. Finding that the encounter was totally accidental and without any orchestration by the state, the trial justice allowed Mr. Perrin to identify Spratt at trial. The hearing justice, upon review of Spratt's postconviction-relief application, recognized that extensive effort at trial, stating that the "chance encounter * * * ha[d] been gone over and fully briefed and argued during the course of the trial, and clearly [Mr. Perrin] had an independent recollection of [Spratt]." Accordingly, we discern no error in the hearing justice's finding that Spratt's contention was without merit.

**B**

**Mr. Perrin's In–Court Identification**

Spratt next alleges that in an elaborate conspiracy, the state deliberately withheld material and exculpatory evidence from him during and after trial and later coerced Mr. Perrin to lie on the witness stand. Spratt alleges that on the night of the murder, the police showed Mr. Perrin a photographic array of frontal photographs only, which contained Spratt's picture. Although Mr. Perrin testified that he recognized one person from the photographs and "was about 90 percent sure on which one [he] would have picked out[,]" he nevertheless refused to select one until he could see a photographic array containing profile photographs.[5]

5. As discussed *infra*, the record suggests that the police did, in fact, have in their possession at that time, four sets of front and profile arrest photographs of Spratt—one set from his arrest of the crime in question and three more sets from earlier and unrelated crimes. It is not readily apparent from the record why

Spratt's conspiracy theory continues in that, after he was arrested later that night, the police took "five or six" additional profile photographs of him which, he says, they showed to Mr. Perrin the next day. Spratt alleges that Mr. Perrin was still unable to identify Spratt as the perpetrator, even after viewing the "five or six" additional profile photographs taken of Spratt the night before. Rather than releasing Spratt from custody due to a lack of any eyewitness identification, Spratt contends the police charged him with the crimes. Subsequently, to cover up the fact that the police did not have a positive identification, Spratt claims the police coerced Mr. Perrin to testify at trial that he was never shown any profile photographs whatsoever.

To support his claims, Spratt has submitted to this Court an undated copy of what he asserts is a single frontal photograph of him taken after his arrest on December 20, 1995. Next to the frontal photograph is a handwritten notation, presumably written by Spratt, indicating the lack of a corresponding profile photograph. Additionally, he has submitted two short excerpts from the trial transcript. The first demonstrates defense counsel's indication to the trial justice, outside the presence of the jury, that a photograph of Spratt, which was used by police in a photo array shown to Mr. Perrin, was taken the night of the incident after Spratt was arrested. The second excerpt is a portion of Mr. Perrin's testimony indicating that the police invited him to the police station to view photographs—none of which were profile photos.

Contrary to Spratt's recollections, the record suggests a slightly different timeline. The record contains a "witness statement" by Mr. Perrin, dated the night of the murder, December 20, 1995, in which the police did not use the profile photographs

Mr. Perrin describes witnessing a man running from the booth after the victim was shot. The record also contains a "photo lineup instructions" form, signed by Mr. Perrin and dated December 21, 1995, indicating that Mr. Perrin was shown a photo array on that date. Furthermore, excerpts from the trial transcript specify that it was the day after the murder, December 21, 1995, when Mr. Perrin was shown the photo array containing Spratt's frontal photograph.

Thus, the record clearly shows that, after giving a witness statement to police on the night of the murder, Mr. Perrin was shown a photo array of frontal photographs the next day, December 21, 1995, at which time Mr. Perrin refused to pick out a photograph despite being "90 percent sure * * *." When he requested from the police that they provide him with a profile photograph array, he was told that the police did not have anything "set up" for him to look at.

In regard to the "five or six" additional profile photographs Spratt alleges were taken after this inconclusive photographic identification procedure, there is no evidence whatsoever supporting Spratt's contention that they ever existed. Spratt's attorney, during cross-examination of Mr. Perrin, inquired at least twice about whether Mr. Perrin had ever been shown any profile photographs "of anybody" by the police at any time. On both occasions, Mr. Perrin testified that he had never been shown any such photographs. Simply put, the record is devoid of any support for Spratt's contention that the police took "five or six" additional profile photographs of him, showed them to Mr. Perrin, and then, after Mr. Perrin was allegedly still unable to identify Spratt, coerced Mr. Perrin into denying at trial that he was

from these arrest photographs.

shown the alleged "five or six" additional profile photographs. In regard to the issue of Mr. Perrin's in-court identification of Spratt, applicant here has not met his burden of showing sufficient evidence of the state's coercion of Mr. Perrin.

## C

### Alleged Withholding of Photographs

■ Spratt next asserts that the hearing justice erroneously denied his claim that the state improperly withheld various photographs in violation of the due process requirements set forth in *Brady* and Rule 16(a)(4).[6] As evidence of this alleged misconduct, Spratt points to the fact that in November 2008, in response to Spratt's discovery request during his postconviction-relief action, the state produced four sets of frontal and profile photographs taken of Spratt—one set consisting of a frontal and profile photograph taken on the night he was arrested for the crime in question (December 20, 1995), as well as three sets of frontal and profile photographs of Spratt the police had in their possession from his prior arrests on unrelated charges (arrest photographs).[7,8] Spratt avers, therefore, that his immediate release should be granted and his sentence vacated because (1) the state improperly withheld the four sets of arrest photographs as long as it did, and because (2) the state is still withholding the "five or six" additional profile photographs he al-

leges were taken subsequent to his arrest. With both contentions, we disagree.

Regarding the four sets of Spratt's arrest photographs, the hearing justice noted that they "were valueless for purposes of the case at trial, because Mr. Perrin's identification of [Spratt during trial] was not based upon [the arrest] photographs." He articulated further that the four sets of arrest photographs "had nothing to do with whether he could or could not identify [Spratt] in court." The hearing justice additionally found that "[i]t was clear in [Mr. Perrin's] mind when he saw [Spratt] in the hallway on a chance encounter that [was] * * * fully briefed and argued during the course of the trial * * * [that Mr. Perrin] had an independent recollection of [Spratt]." He also reiterated that Mr. Perrin's identification of applicant was "rock-solid." Therefore, this Court finds no error in the hearing justice's determination that Mr. Perrin's identification of Spratt was not based on any identification from a photograph, but was instead based on the chance encounter at the courthouse and on having witnessed the crime itself.

This Court also considers whether the disclosure at trial of the four sets of arrest photographs would have affected the outcome of the case. Because of the abundant evidence of Spratt's guilt, we conclude that, even if the state had produced Spratt's four sets of arrest photographs during trial, such production would not have avoided his conviction. We note, as

---

**6.** Rule 16(a)(4) of the Superior Court Rules of Criminal Procedure obligates the state to make available to a requesting defendant "all books, papers, documents, photographs, * * * which are intended for use by the [s]tate as evidence at the trial or were obtained from or belong to the defendant[.]"

**7.** The arrest dates indicated on these arrest photographs are December 20, 1995, December 26, 1991, June 24, 1994, and July 24, 1989.

**8.** Again, while logic suggests that the police had these arrest photographs of Spratt (which include profile photographs) in their possession when they showed Mr. Perrin the frontal-only photographic array the day after the murder, the record does not disclose why the police never used any profile photos from prior arrests in a photo array as requested by Mr. Perrin.

did the hearing justice, that Spratt's guilt "was not predicated solely upon [the testimony of] Mr. Perrin." Indeed, the hearing justice recalled that "there was other strong and overwhelming testimony" indicating Spratt's culpability. For example, in addition to Mr. Perrin's testimony, the hearing justice took note of the witness testimony of Mr. Warren and Mr. Tortolani, both called by the state, who testified about Spratt's actions on the night of the murder. The hearing justice continued by finding that the accumulation of evidence against Spratt at trial was "devastatingly inculpatory." Therefore, this Court concludes that even if Spratt's four sets of arrest photographs had been produced before trial, he has fallen significantly short in demonstrating any "likelihood that trial counsel[,] using the undisclosed information[,] could have created a reasonable doubt in the minds of one or more jurors to avoid a conviction." *State v. Pona*, 810 A.2d 245, 250 (R.I.2002) (quoting *State v. Bibee*, 559 A.2d 618, 621 (R.I.1989)).

In regard to Spratt's theory that the police took "five or six" additional profile photographs of him after Mr. Perrin requested a profile photo array (above and beyond the four sets of arrest photographs already produced, as discussed *supra* )— and that the state allegedly continues to improperly withhold these "five or six" additional profile photographs—we discern no evidence from the record that the police ever took these "five or six" additional profile photographs.

In sum, Spratt has not met his burden in showing that any discovery violation occurred. Even if the state had produced Spratt's arrest photographs, it is unreasonable to conclude that the jury verdict might have been different. Concerning the alleged "five or six" profile photographs that Spratt alleges were taken after his arrest, the hearing justice properly concluded that, other than Spratt's own "speculation upon speculation," there is absolutely no evidence of the existence of these "five or six" additional profile photographs. Thus, this Court finds no error in the hearing justice's dismissal of Spratt's claim of discovery violations.

**D**

**Unlawful Sentencing**

■ Spratt also argues on appeal that the hearing justice incorrectly rejected his claim of unlawful sentencing. He asserts that the trial justice improperly invoked the habitual-criminal statute by finding Spratt a habitual criminal and sentencing him to an additional twenty years. Spratt contends that he should not have been sentenced as a habitual criminal because, prior to this conviction, he had served only two six-month sentences for prior felonies.

Spratt's reasoning ignores the clear language of the habitual-criminal statute, G.L. 1956 § 12–19–21, which reads in pertinent part:

"(a) If any person who has been previously convicted in this or any other state of two (2) or more felony offenses arising from separate and distinct incidents and sentenced on two (2) or more occasions to serve a term in prison is, after the convictions and sentences, convicted in this state of any offense punished by imprisonment for more than one year, that person shall be deemed a 'habitual criminal.' Upon conviction, the person deemed a habitual criminal shall be punished by imprisonment in the adult correctional institutions for a term not exceeding twenty-five (25) years, in addition to any sentence imposed for the offense of which he or she was last convicted.

"(b) * * * If it appears by a preponderance of the evidence presented that

the defendant is a habitual criminal under this section, he or she shall be sentenced by the court to an additional consecutive term of imprisonment not exceeding twenty-five (25) years * * *."

It appears from Spratt's submitted briefs that he contends that the statute was intended to only apply to someone with a more extensive criminal record. However, we apply the statute's language as it is plainly written. *See Iselin v. Retirement Board of the Employees' Retirement System of Rhode Island,* 943 A.2d 1045, 1049 (R.I.2008). Had the Legislature intended for different standards to apply, it would have so stated. Accordingly, we find Spratt's unlawful sentencing contention to be unavailing.

## E

### Ineffective Assistance of Counsel

On appeal, Spratt next contends that the hearing justice wrongly dismissed his assertions of ineffective assistance of counsel based primarily on trial counsel's (1) failure to uncover the state's .alleged misconduct with respect to Mr. Perrin's testimony, and (2) failure to elicit evidence suggesting that the police later found the gun used as the murder weapon in the hands of another criminal approximately eight months after the crime at issue.

■ "This Court employs the two-prong test set forth by the United States Supreme Court in *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), when assessing whether an applicant should be granted relief from a conviction because of ineffective assistance of counsel." *Brown,* 32 A.3d at 904 n. 3 (citing *Page v. State,* 995 A.2d 934, 942 (R.I.2010)). "To satisfy this two-part inquiry, an applicant must prove that: '(1) counsel's performance was deficient and (2) the deficient performance prejudiced

the defense.'" *Id.* (quoting *Torres v. State,* 19 A.3d 71, 76 (R.I.2011)).

■ As to the state's alleged misconduct with respect to Mr. Perrin's testimony, we emphasize that no Rule 16 or *Brady* violation occurred in regard to the arrest photographs, as discussed *supra.* In so doing, we conclude that Spratt has not met his "burden * * * to prove that his 'counsel's representation fell below an objective standard of reasonableness.'" *Chapdelaine,* 32 A.3d at 944 (quoting *Strickland,* 466 U.S. at 688, 104 S.Ct. 2052). Indeed, the hearing justice repeatedly made note of trial counsel's effectiveness, in stating, for example, that "insofar as [Spratt's trial counsel] is concerned, he did an ample, respectable and excellent job representing [Spratt] the best he could. He was a thorough and engaging attorney and zealous on [his] behalf."

■ Spratt also alleges that his trial counsel was ineffective in not presenting evidence that, eight months after Mr. Naylor was killed on December 20, 1995, the gun that was used in his killing was found by police in the possession of another criminal. Again, Spratt has failed to overcome the "strong presumption" that his trial counsel's representation was not unreasonable. *Neufville v. State,* 13 A.3d 607, 610 (R.I.2011) (citing *Hazard v. State,* 968 A.2d 886, 892 (R.I.2009)). Even if we considered trial counsel's decision to not present this argument during trial to be error, there is no reasonable probability that the jury would have returned with a different verdict.

Because we are of the opinion that there was no evidence of any misconduct by the state for Spratt's trial counsel to "uncover," and because the trial counsel's failure to present evidence of the whereabouts of the gun months after the crime did not prejudice Spratt, his allegations of ineffec-

tive assistance of counsel necessarily must fail.

## F

### Insufficient Evidence of Guilt

Finally, Spratt argues that the evidence that the state presented at trial was insufficient to convict him. The hearing justice repeatedly made reference to the "overwhelming evidence of [Spratt's] guilt" and, in particular, to the three separate witnesses to the crime that evening that sufficiently identified Spratt as the perpetrator—Mr. Perrin, Mr. Warren, and Mr. Tortolani. The applicant has failed to present any indication "that the [hearing] justice overlooked or misconceived material evidence" sufficient to justify us disturbing his decision. *Chapdelaine*, 32 A.3d at 941 (quoting *Gordon*, 18 A.3d at 473). Accordingly, we find no error in the hearing justice's analysis, and resultant dismissal, of this particular claim.

## V

### Conclusion

For the reasons stated in this opinion, we affirm the judgment of the Superior Court denying Spratt's application for postconviction relief. The record shall be remanded to the Superior Court.